## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**OSCAR NOE RECINOS GARCIA**<br>**a/k/a "PSYCHO,"**<br><br>**Defendant.** | **Criminal No. 15-10338-FDS** |

## OPPOSITION OF THE UNITED STATES TO
## OSCAR NOE RECINOS GARCIA'S MOTION TO SUPPRESS

The United States opposes the Motion to Suppress filed by defendant Oscar Noe Recinos Garcia a/k/a "Psycho" seeking to suppress a gun and other items seized from a rooming house at 142 Broadway in Somerville, Massachusetts on July 8, 2015. On that date—following a tense, uncertain, and rapidly-evolving encounter with six MS-13 members in a closely-enclosed space—law enforcement agents arrested six individuals (including defendant Recinos Garcia) for immigration violations and seized certain weapons and gang-related paraphernalia from the immediate vicinity of the arrestees. Agents seized these items based on well-known exceptions to the warrant requirement: the searches and seizures were justified both by exigent circumstances and by the search incident to arrest exception. There was no Fourth Amendment violation and the defendant's motion should be DENIED.

## I.      FACTUAL BACKGROUND

The challenged search and seizure took place on July 8, 2015 at 142 Broadway in Somerville, Massachusetts. 142 Broadway is a three-floor rooming house, and on

the day in question, numerous MS-13 members were sharing one of the rooms on the top floor or Apartment 3 of that address (the "apartment").[1]

On the morning of July 8, 2015, agents from Homeland Security Investigations/Immigration and Customs Enforcement ("HSI"), supported by Somerville Police, went to 142 Broadway to conduct immigration investigation and enforcement activity.  The two agents leading the efforts were HSI SA Sean Connolly and Somerville Police Det. James Slattery.

Before any law enforcement agents walked into the apartment on July 8, 2015, law enforcement was already aware that MS-13 associates lived at that address.[2] Importantly, even before they entered the apartment on July 8, 2015, Agent Connolly and others were aware that Recinos Garcia lived at that address and that HSI had the ability to arrest Recinos Garcia administratively for immigration proceedings. Exactly a week prior, on July 1, 2015, Agent Connolly, Det. Slattery, and others visited this same address, where they met with many of the same individuals they later encountered on July 8, 2015, including Recinos Garcia and co-defendant Julio Esau Avalos Alvarado a/k/a "Violento."

---

[1]     The "apartment" in question is a small, one-room unit that had two mattresses on the floor and did not have its own private bathroom.

[2]     On January 2, 2015, Somerville detectives searched this same apartment and recovered over 50 rounds of ammunition and a long dagger-type knife used by Jose Rene Andrade a/k/a "Triste" a/k/a "Inocente" to commit a stabbing.  HSI later arrested Andrade on June 2, 2015, barely a month prior to the incident at issue, at the same apartment.  Andrade was subsequently indicted in this case and is a co-defendant scheduled to go to trial with Recinos Garcia.

As part of the investigative and enforcement activity on July 1, 2015, Agent Connolly took photographs of the apartment, including the following photograph that shows both Recinos Garcia and the bookcase and surrounding area whose search defendant is now challenging:



Exhibit 1, July 1, 2015 photograph by Agent Connolly.  The defendant is in the foreground of this photograph in blue, while the background shows the bookcase holding clothes from which agents seized a gun a week later on July 8, 2015.  This bookcase was in relatively the same position and condition a week later on July 8, 2015 (*see infra* Exhibit 2).

During the July 1, 2015 interaction, Agent Connolly personally met with and identified Recinos Garcia, and Agent Connolly obtained information about the defendant's immigration status. In short, based on that interaction, Agent Connolly knew that Recinos Garcia was an alien who was present in the United States without lawful admission or parole. *See* Immigration and Nationality Act, §212(a)(6)(A)(i), (codified at 8 U.S.C. § 1182(a)(6)(A)(i)) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."). Based on enforcement priorities, agents had the discretion on whether to make such an administrative arrest—and they chose not to do so on July 1, 2015—but that does not mean that the immigration status of Recinos Garcia and others was any different on July 8, 2015 when they were subsequently arrested.

On the morning of July 8, 2015, Agent Connolly, Det. Slattery, and others returned to 142 Broadway. That day, Agent Connolly and HSI were especially interested in finding an individual named Salvador Alberto Castro Ramos, a known member of MS-13, who they believed may be one of the individuals staying at this rooming house or apartment. When they got to the address, they were given consent to enter by one of the residents of the building.[3] On the third floor, they noticed a strong odor of marijuana as they headed to the apartment in question where they had

---

[3]     One of the reports produced in discovery references both a consent to enter and consent to search. Agent Connolly did not write that report. Agent Connolly is the agent who obtained the consent to enter from Avalos Alvarado. Agent Connolly is expected to testify that only consent to enter was sought/given, and the government does not intend to defend the search on consent grounds.

been the week prior.  They knocked on the door and they were given consent to enter by Avalos Alvarado, one of the men who they had met the prior week at that same apartment.  At approximately 7:05 a.m., Avalos Alvarado gave consent to enter and Agent Connolly and Det. Slattery entered the apartment for a consensual conversation with the residents.

Upon entering the apartment, Agent Connolly and Det. Slattery encountered five men in the small room: (1) Avalos Alvarado; (2) Recinos Garcia; (3) Josue Alexis de Paz; (4) Jose Miguel Hernandez; and (5) Manuel Diaz Granados.[4]   The room contained minimal furnishings, had two mattresses on the ground, and there was barely enough space for the five occupants and the two agents.

Immediately upon entering, and in plain view, Agent Connolly noticed a large knife on the nightstand.  The blade of the large knife was wrapped by tape in a makeshift sheath, something that is commonly done by MS-13 members.  Det. Slattery and Agent Connolly then noticed—again in plain view—gang paraphernalia including blue and white rosary beads, blue baseball caps including one with "503" on it, the area code for El Salvador, and pictures on the wall with photos of one of the residents flashing gang signs.

At this stage, only Agent Connolly and Det. Slattery were in the room.  Other law enforcement agents were outside the room, and one later came in, but at no point prior to the seizure of the gun and other weapons were more than three agents in the room.  Conversely, there were five suspected MS-13 members in the room and at least

---

[4]    All five of these men are MS-13 members charged in the pending indictment.

one weapon in plain sight, along with gang paraphernalia.  The five residents were asked if there was anyone else in the room, and they said no.  Having already found a knife in a makeshift sheath, agents also asked the occupants of the room if there were any other weapons in the room, and they said no.

The cramped room barely had enough space for the agents to move freely, and nearly every inch of the room was within arm's reach of one of the MS-13 members. Two of the men, defendant Recinos Garcia and co-defendant Avalos Alvarado, were standing in front of the bookcase, almost as if to shield it from the agents, while the other three were a few feet away.  Given the crowded space and the fact that the suspected MS-13 members outnumbered the agents in the room, Det. Slattery opened the closet door in the room to ensure that it posed no danger.  Much to his surprise, he found a Hispanic male inside the closet trying to hide amongst some clothes.  That individual—later identified as Oseas Michael Cartegena—resisted coming out, a third agent had to enter the room, and Cartegena was forcibly removed, placed on the floor, and handcuffed.

Notably, while this was going on, Agent Connolly was taking pictures in real-time, just like he did when he was there a week prior on July 1, 2015.  One of the pictures captures the moment right around the time that Cartegena is encountered hiding in the closet while defendant Recinos Garcia and co-defendant Avalos Alvarado stand in front of the bookcase as if to shield it from view:



Exhibit 2, July 8, 2015 Photograph by Agent Connolly.  This picture shows (i) the nightstand on which a knife had been found in plain view; (ii) the gang-related items (blue and white rosary beads and blue "503" hat) seen in plain view; (iii) Recinos Garcia (background) and Avalos Alvarado (foreground) standing in front of the bookcase where a gun and large knife were found shortly hereafter; and (iv) the open closet door on the right where Cartegana was found hiding.

Given the multiple factors giving rise to concerns about officer safety—known MS-13 hangout; defendant and others known to agents; at least one weapon and gang paraphernalia observed in plain view; occupants lied; agents found man hiding in closet; and the entire room within arm's reach of the occupants, who outnumbered the agents—Det. Slattery decided to lift the clothes on the bookcase to ensure that additional items that may threaten officer safety were not accessible to the occupants. He first encountered baggies of marijuana under an article of clothing, and then lifted a pair of pants and found a firearm.  Again, a picture helpfully captures the scene:



Exhibit 3, July 8, 2015 Photograph by Agent Connolly.  This picture shows the occupants sitting a few feet from the bookcase while Det. Slattery and the other agent are near the bookcase.  As seen in this photograph, the occupants were still close enough to lunge for a weapon from the bookcase, and indeed, the defendant himself was the one closest to where the gun was found and barely an arm's length from the bookcase.  After finding the gun between the clothes, Det. Slattery subsequently found another large knife at the bottom of the bookcase.

All the men were arrested by HSI and administrative proceedings were subsequently begun against the defendant and others under the Immigration and Nationality Act.

Subsequently, the five men first encountered by agents were charged with RICO conspiracy as part of this federal case, and Recinos Garcia and Avalos Alvarado were also charged in Count One with being aliens in possession of a firearm (for the same firearm that was seized from the bookcase they were standing in front of during this July 8, 2015 incident).  Avalos Alvarado, who gave the initial consent to enter that day, has pled guilty to both the firearm charge and RICO conspiracy.

## II.   ARGUMENT

### A. The Agents Had Consent to Enter the Room

"Although a warrantless entry into an individual's residence is presumptively unreasonable, a valid consent to the entry … vitiates any Fourth Amendment concern." *United States v. Gamache*, 792 F.3d 194, 198 (1st Cir. 2015) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).  Here, Agent Connolly obtained consent from Alvarado—who he had also met a week prior—to enter the room and speak to the

residents.   Accordingly, there is no Fourth Amendment violation in the agents entering the room.

The Court can also take judicial notice of the guilty plea of Avalos Alvarado, the person who gave consent to enter, and who then pled guilty to the exact same firearm and RICO conspiracy charge that the defendant is now fighting. *See* Dkt. No. 1259 (Plea Agreement of Avalos Alvarodo).  Presumably, Avalos Alvarado would not have pled guilty to possessing the same firearm at the same time and at the same place if Avalos Alvarado believed that agents were in his room illegally.

## B. The Search Was a Lawful Search Incident to Arrest.

Perhaps the easiest basis to justify the search is the search incident to arrest exception to the warrant requirement, which the defendant's motion does not address.  Under the Fourth Amendment, officers are entitled to conduct a warrantless search of an arrestee incident to that arrest. *See, e.g.*, *United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) (*citing Chimel v. California*, 395 U.S. 752, 763 (1969)). Here, Agent Connolly had probable cause to arrest Recinos Garcia even before the search of the bookcase (or any other area), thus validating the search of Recinos Garcia or any area in close proximity where he might reach for a weapon.  A few blackletter law principles combine to compel that finding:

*First*, courts have long held that agents may conduct a search incident to arrest even *before* making an arrest as long as there is probable cause to arrest *prior* to the search. *See, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *United States v. Lawlor*, 406 F.3d 37, 41-42 (1st Cir. 2005).  In other words, officers may conduct a search incident to arrest if the individual is *arrestable*. Here, as soon as Agent

Connolly entered the room and saw Recinos Garcia, he knew that he could arrest Recinos Garcia should he so choose for violation of the Immigration and Nationality Act. *See, e.g.*, 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."). That is information about Recinos Garcia that Agent Connolly already had based on his interaction and investigation the prior week. Whether Agent Connolly subjectively intended to arrest Recinos Garcia as soon as he entered the room is immaterial. What is key is that walking into that room, Agent Connolly already knew all the information that would have authorized him to administratively arrest Recinos Garcia, and as soon as he recognized Recinos Garcia, he could have effectuated that arrest. Further, in July 2015, HSI was prioritizing actions against individuals with gang affiliations, and accordingly, the MS-13 paraphernalia and a large butcher knife in a homemade sheath in plain view would only have given Agent Connolly further reason to use his discretion and arrest Recinos Garcia (all before any gun or knife or marijuana were seized from the bookcase).

*Second*, it is similarly settled-law that government agents conducting administrative arrests "have a right of incidental search analogous to the search permitted criminal law-enforcement officers." *Abel v. United States*, 362 U.S. 217, 237 (1960). Thus, even an arrest solely to initiate administrative immigration proceedings against Recinos Garcia would have allowed Agent Connolly to conduct a search incident to arrest.

*Third*, in a search incident to arrest, the searchable area is the arrestee's person as well as "the area into which an arrestee might reach in order grab a weapon or evidentiary items." *United States v. Wurie*, 728 F.3d 1, 3-4 (1st Cir. 2013); *see also Nascimento*, 491 F.3d at 51 (cabinet eight to ten feet away from unrestrained suspect fell within his "grab area," even though the two officers stood between suspect and the cabinet).  Thus, it was entirely proper for the agents to search not only Recinos Garcia and the other occupants, but the bookcase or the table that was a mere arm's reach away from Recinos Garcia.

## C.  **The Search Was Lawful as a Protective Sweep.**

Additionally, the search was also lawful because it was part of a protective sweep for officer safety.   It is similarly settled law that in the absence of a search warrant, officers may conduct "protective sweeps" or a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of officers or others." *United States v. Winston*, 444 F.3d 115, 118 (1st Cir. 2006). In order to perform a protective sweep, officers first must a have a reasonable suspicion of danger, *i.e.*, "there must be articulable facts, which taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing the area to be swept harbors an individual posing a danger to those on the arrest scene." *Winston*, 444 F.3d at 334; *United States v. Martins*, 413 F.3d 139, 149 (1st Cir. 2005) (the reasonable suspicion standard is "considerably less demanding than the level of proof required to support a finding of probable cause"). Second, "the scope of the sweep must be limited in its purpose," *i.e.*, only to places where a person may be found.  *Maryland v. Buie*, 495 U.S. 325 (1990).  Those requirements are easily

satisfied in this case given the totality of the circumstances, which, at the very least, justified the search of the closet where Cartegena was found.

From there, the circumstances only became more exigent and concerning. In such situations, where officers are outnumbered by MS-13 gang members, agents have already found a weapon within arm's reach, the suspected gang members are not handcuffed, and additional weapons may be hidden within arm's reach, it is entirely justifiable for officers to quickly skim through the bookcase to ensure that weapons are not hidden there. Here, both a gun and a knife were found there.

Courts have routinely held that "Officers who have a legitimate concern for their safety…may search areas that may conceal a threat to them without a warrant." *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009) (search for a firearm beneath a bed sheet that suspect was standing beside was permissible). *See also United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1029 (8th Cir. 2007) (an officer who "reasonably perceived a risk of danger to everyone in the room" was justified in searching beneath the suspect's pillow for a gun); *United States v. Quigley,* 631 F.2d 415, 419 (5th Cir.1980) (search that uncovered a gun hidden underneath a mattress—which for all the officers knew, was within reach of the suspect during arrest—was "in the face of a serious and demonstrable potentiality for danger to the arresting officers" and therefore justified).

## **CONCLUSION**

The items seized from the house were all seized pursuant to well-recognized exceptions to the warrant requirement, and were all either in plain view, seized

pursuant to a search incident to arrest, or seized as part of a protective sweep and in

exigent circumstances.  The defendant's motion should be DENIED.

<div style="margin-left: 40%;">

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

</div>

By:    */s/ Kunal Pasricha*
        KUNAL PASRICHA

<div style="margin-left: 40%;">

GLENN A. MACKINLAY
CHRISTOPHER J. POHL
KELLY B. LAWRENCE
Assistant United States Attorneys
United States Attorney's Office
1 Courthouse Way
Boston, MA 02210

</div>

## **CERTIFICATE OF SERVICE**

I, Kunal Pasricha, certify that on February 9, 2018, I served this document

upon counsel of record by filing it through the CM/ECF system.

*/s/ Kunal Pasricha*
KUNAL PASRICHA
Assistant United States Attorney