UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | } | |
| | } | |
| v. | } | CASE NO. 15-CR-10338-FDS |
| | } | |
| OSCAR NOE RECINES-GARCIA | } | |
| Defendant. | } | |
| | } | |

**DEFENDANT RECINES-GARCIA'S SENTENCING MEMORANDUM**

Oscar Recines-Garcia submits the following sentencing memorandum to aid the Court in crafting the appropriate disposition for this case.

**Introduction**

Oscar Recines-Garcia, a 25-year-old man with no criminal record, is facing what will undoubtedly be a lengthy prison sentence, followed by a period of immigration detention and certain deportation. Although the Government plans to request a custody term of twenty-four years, this Court has full discretion to sentence as it sees fit. Yet when the Court considers what sentence to impose, it does not do so on a blank slate. Many others in this case have come before it already. Most, if not all, have received what the Government has requested.

So the question, then, is why should Mr. Recines-Garcia be any different? Why should he not simply be sentenced to the term requested by the Government? This is not a case where addiction, mental illness, or childhood trauma could ever be used to justify the charged conduct. That the Defendant was sent here by his parents as a teenager, alone and on foot, does little to distinguish him from many of his co-defendants.

1

The answer to that question is one word: fairness. Counsel realizes that this word may not be the first that comes to mind when dealing with a participant in a planned execution. But as this Court knows, the § 3553 factors require equity even among those whose conduct is reprehensible, whose sentences are likely to be substantial, and whose personal history do not necessarily cry out for leniency.

In some ways, it is these cases which are the hardest. Because what is "fair" in the moral sense or even the constitutional sense, may be substantially higher than what is just under the laws of federal sentencing. For example, in state court, each of the defendants convicted of a planned murder would be given a life sentence. So long as the conviction remained, the sentence would be immune from attack. Yet the federal system, certainly not thought by many to be lenient, gives judges the power -- and the responsibility -- to be more precise. Not every defendant convicted of murder had the same role in the offense. Defendants whose behavior was equivalent should receive similar sentences. Where the Defendant fits in the scheme of this case, while certainly not an easy question, is also one which the Court cannot ignore.

The Defendant realizes that he is asking the Court to do something difficult, to give a below Guideline sentence for a convicted murderer. Yet if the Court considers his role in the offense and the sentences that others have received or will receive for similar or worse conduct, it will see that a sentence of 18 years in prison with three years of supervised release is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

## Procedural History

On July 8, 2015, Oscar Noe Recines-Garcia[1], was arrested by immigration officials in Somerville. He was detained by ICE from that date to November 10, 2015, when he was indicted in this Court for being an alien in possession of a firearm. PSR at pg. 2. On March 21, 2018, Recines-Garcia pled guilty to two counts of a nineteen-count indictment. Count one charged him with being an Alien in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(5)(A); and Count 2 charged Conspiracy to Conduct Enterprise Affairs through a Pattern of Racketeering Activity, in violation of 18 U.S.C. § 1962(d). Pursuant to the signed plea agreement, the Government has agreed to recommend 288 months, or 24 years in prison, followed by five years of supervised release. PSR at ¶¶1-4.

## Defendant's History and Characteristics[2]

In 2009, at age 16, the defendant left El Salvador and walked across the border through Mexico into the United States. He came, as many do, in search of work, hoping to leave behind a life of poverty and violence. Initially, Mr. Recines-Garcia was detained at the border. But eventually, he was released on bail pending an asylum claim to family in Florida, where he lived for approximately a year and a half. PSR at ¶¶69-70.

After that, he moved to Portland, Maine for approximately one year, where he attended the local high school. While there, he lived with an uncle, who helped support him. When his uncle died in an accident, Recines-Garcia moved to the

---

[1] Counsel uses the spelling of the name as is listed on the docket.
[2] These facts are taken from the PSR and from conversations with the Defendant.

Boston area where he worked as a dishwasher in a downtown restaurant. At the

time of his arrest, the defendant was renting a room at 142 Broadway in Somerville,

Massachusetts, where he had lived for approximately one week. PSR at ¶¶69-70.

**Argument**

I.      **The Defendant should be sentenced to 216 months in prison,
        followed by three years of supervised release**

The Defendant should be sentenced to 18 years in prison, or 216 months. A

sentence of this length complies with the purposes of sentencing outlined in 18

U.S.C. § 3553. "It has been uniform and constant in the federal judicial tradition for

the sentencing judge to consider every convicted person as an individual and every

case as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S.

38, 51(2007). Above all, a court's final determination of a sentence must reflect "§

3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater

than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely,

retribution, deterrence, incapacitation, and rehabilitation. See *Kimbrough v. United

States*, 552 U.S. 85, 101 (2007).[3]. Here, the sentencing factors enumerated in §

3553(a) favor the Defendant's requested disposition.

---

[3] This clause is known as the parsimony clause, which is "an overarching provision," and represents
a cap above which a District Court is statutorily prohibited from sentencing above, even when a
greater sentence is recommended by the advisory Sentencing Guidelines. *Kimbrough*, 552 U.S. at
101. Accordingly, pursuant to 18 U.S.C. § 3553(a) the Guidelines are statutorily subordinate to the
parsimony clause. See *Kimbrough*, 552 U.S. at 101-102. After properly determining the Guidelines
range as an "initial benchmark," District Courts must then consider each of the § 3553(a) factors to
impose a sentence sufficient, but not greater than necessary to fulfill the purposes of sentencing. *See
Gall*, 552 U.S. at 596-597. Accordingly, in this context, Courts must not presume the advisory
Guidelines to be reasonable, and may not afford the Guidelines any greater weight than the other §
3553 factors.

### A.  Mr. Recines-Garcia is less culpable than the others who have pled guilty to the same crime

While the Defendant is both legally and morally responsible for the murder of Jose Aguilar Villanueva, aka "*Fantasma,*" his role in the offense was more attenuated than nearly all others charged with the same crime. Unlike *Terible*, *Inocente* and *Crazy*, he was neither a leader within the ELS clique, nor did he, as they did, conceive of the plan to murder Villanueva. Unlike *Perverso*, who has not been captured, and *Gato*, who has yet to be sentenced, he did not personally participate in any act of violence.

Instead, he played two roles in the offense. First, he repeated an order to *Gato* that Villanueva be killed, an order that had already been issued by gang leadership. Second, he helped clean up afterwards, along with several others, including *Little Crazy*. As neither the originator of the plan, nor the one who carried it out, the Defendant's role in the crime is less integral than the others involved. His punishment should reflect this disparity.

### B.  Mr. Recines-Garcia's history and characteristics and the nature and circumstances of the offense favor the proposed sentence

Mr. Recines-Garcia's history and characteristics support the requested sentence. Like many in this case, he came to this country as an unaccompanied teenager. Yet counsel does not intend to leverage his difficult childhood or his challenging adjustment to life in this country to support his request. Instead, counsel notes that, whatever sentence the Defendant receives will likely result in an even longer period of custody. First, he will serve every day of the sentence this

Honorable Court deems necessary, with no option for a hallway house during the last six months. At the end of that period, he is likely to be taken into immigration custody to await removal proceedings. *See PSR*, at pg. 2. How much time he will spend in immigration detention is unknown, yet some sources suggest that the average time awaiting the conclusion of a case in immigration court is 577 days; more than a year and a half. *See Infographic: How Long Are People in Detention*, Center for American Progress.[4] Regardless of the exact length of time he remains in custody, Mr. Recines-Garcia is likely to be shipped between various immigration detention centers awaiting his removal. At some point in the distant future, he will be shipped back to El Salvador, his home country, where he has not been in nearly 10 years. *PSR* at ¶69. The Court should consider this additional period of detention when fashioning its sentence.

### C. The requested sentence would have an "adequate" deterrent effect, both generally and specifically

#### i. General Deterrence

The requested sentence would have an adequate deterrent effect on the general public. Research has consistently indicated that the certainty of punishment is more effective at achieving general deterrence than the severity of punishment. Indeed, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science

---

[4] available at
<https://www.americanprogress.org/issues/immigration/news2014/05/09/89391/infographic-how-long-are-people-in-detention/ >.

panels ... reached that conclusion, as has every major survey of the evidence." *Id*.

*See also* Zvi D. Gabbay, *Exploring the Limits of Restorative Justice Paradigm:*

*Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48

(207) ("certainty of punishment is empirically known to be a far better deterrent

than its severity."); Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime:*

*Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[5] ("The key empirical

conclusions of our literature review are that at prevailing levels of certainty and

severity, relatively little reliable evidence of variation in the severity of punishment

having a substantial deterrent effect is available and that relatively strong evidence

indicates that variation in the certainty of punishment has a large deterrent effect,

particularly from the vantage point of specific programs that alter the use of

police."); Raymond Pasternoster, *How Much Do We Really Know About Criminal*

*Deterrence*, 100 Crim. L. & Criminology 765, 817-18 (2010) (There is "no real

evidence of a deterrent effect for severity ... [I]n virtually every deterrence study to

date, the perceived certainty of punishment was more important than the perceived

severity.").

  The findings of the Institute of Criminology at Cambridge University on

general deterrence are typical of those in the field. Andrew von Hirsch et al.,

*Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).

The report examined penalties in the United States and several European

countries, and examined the effects of changes to both the certainty and severity of

punishment. *Id*. at 1. While significant correlations were found between the

---

[5] Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf

certainty of punishment and crime rates, the "correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

Some courts, in departing from the guidelines, have relied in part on the notion that increases in the severity of punishment have little, if any, increased deterrent effect. In *United States v. Murray Lawrence*, 16-CR-243 (E.D.N.Y.), the Court heard testimony from Jeffrey Fagan, Ph.D., who described in detail that general deterrence is impacted by the risks of detection, and not the severity of punishment. *See Judgment, Memorandum, and Order on Sentencing*, at 3-8. Fagan testified that "the consensus of the literature is that deterrence effects really stop [with raising the risk of apprehension, and] that lengthy sentences don't add much to the cost benefit calculation." *Id.* at 5. Thus, increasing the severity of Mr. Recines-Garcia's punishment will have marginal, if any, additional deterrent effects on the general public.

Moreover, general deterrence has already been accomplished by the broad range of sentences the Court has handed out to other defendants in this case, including some for life, or nearly life, in prison. The general public does not need additional deterrence to dissuade it from joining a criminal enterprise and committing violent acts in furtherance of it. The message has been received.

### ii.     Specific Deterrence

There is little reason to believe that Mr. Recines-Garcia will engage in further criminal behavior. At 25 years old, the instant offense is Mr. Recines-Garcia's only criminal conviction. *PSR*, at ¶ 188-189. His only other arrest resulted in a dismissal. When he is released, he will be nearly 40. The recidivism rates for individuals between ages 36 and 40 in criminal history category I is a mere 12.1%. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at Exh. 9, at 28 (May 2004). For individuals over 41 – which Mr. Recines-Garcia will be after completing his period of supervised release – that rate drops even lower to 6.9%. *Id.*

Moreover, it is almost a certainty that Mr. Recines-Garcia will be deported after completing his sentence. Thus, he will be far removed from whatever remains of his past. Many of his former co-defendants will still be in jail. Others will be scattered throughout El Salvador or, in a few cases, the Boston area. He will likely reside in El Salvador with his mother, if she is still living, or one of his sisters. His ability to reconstitute the criminal behavior that led to this case will be significantly diminished.

### D.  The Requested Sentence Avoids Unwarranted Sentencing Disparities Among Similarly-Situated Defendants

Section 3553(a)(6) requires a Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553. The requested sentence of

18 years in prison is in keeping with sentences imposed in this matter for defendants whose culpability is similar to, or greater than, Mr. Recines-Garcia's.

For example, Jose Vasquez, aka *Little Crazy*, recently received a sentence of 212 months. Though *Little Crazy* was not charged with murder, he personally participated in a vicious stabbing that would have been a murder, but for life saving medical treatment and *Little Crazy's* failure to unsheathe his knife at the last moment to deliver the fatal blow. See *U.S. v. Vasquez*, Gov't Sent Memo at pg. 4-5. Moreover, *Little Crazy* was a leader of the TLS clique and was also involved in disposing of evidence from another murder, that of Cristofer de la Cruz, including weapons and bloody clothes. *Id*. His Offense Level was calculated at 39, just one point less than Recines-Garcia, only because the man he tried to stab somehow did not die.

Recines-Garcia is less culpable than *Little Crazy* because he did not personally participate in any violence. While he did plead guilty to a murder, surely *Little Crazy* also had the desire to kill his victim, as evidenced by his conduct during the attack and his statements made after the fact. *U.S. v. Vasquez*, Gov't Sent Memo at pg. 4-5. Further, like *Little Crazy*, the Defendant helped cover up a murder. But, unlike *Little Crazy*, Recines-Garcia was not a leader of his clique and has no prior criminal record.

Even within the ELS clique, the Defendant is near the bottom in terms of culpability. Yet for German Hernandez Escobar, aka *Terible*, the Government intends to recommend 276 months, or 23 years, in prison. The recommendation for

*Terible* is less than that of the Defendant even though it was the Government's theory that *Terible*, the "first word" of ELS, conceived of and ordered the murder of Villanueva from jail, believing that he his cooperation had led to *Terible's* arrest. For Jose Rene Andrade, aka *Inocente*, the Government will recommend 292 months (24 years and 4 months), despite the fact that *Inocente* was originally planning to carry out the murder of Villanueva personally, pled guilty to that murder, as well as another attempted murder, bragged about numerous other crimes while in jail, and likely has a Total Offense Level of 44, four points higher than the Defendant.

Finally, Rafael Leoner-Aguirre, aka *Tremendo*, received a sentence of nineteen years after trial. Yet he was responsible for multiple attempted murders, including a shooting and a stabbing, and held a leadership position within the gang. The Government has no evidence that Recines-Garcia ever personally participated in any act of violence, nor does it (or Probation) seek a leadership enhancement for him. Instead, his conduct, while legally murder, makes him culpably equivalent to those who have received sentences below 240 months.

## Conclusion

For the foregoing reasons, Mr. Recines-Garcia urges this Court to adopt his recommended sentence of 18 years in prison, followed by three years of supervised release. This sentence is sufficient, but no greater than necessary, to achieve the statutory purposes of punishment.

Respectfully submitted,
Oscar Recines-Garcia
By his Attorney,


/s/ Michael Tumposky
Michael Tumposky
BBO No. 660618
Hedges & Tumposky, LLP
50 Congress St., Suite 600
Boston, MA 02109
T) (617) 722-8220
Tumposky@htlawyers.com


**Certificate of Service**

I, Michael Tumposky, hereby certify that, on this the 4th day of September, 2018, I have served a copy of this document, where unable to do so electronically, on all counsel of record.

/s/ Michael Tumposky
Michael Tumposky